**Anny NEWMAN, Plaintiff, Appellant,**

**v.**

**Diana BURGIN, et al.,
Defendants, Appellees.**

**No. 90–1739.**

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1991.

Decided April 22, 1991.

Daniel F. Featherston, Jr. with whom Christopher L. Maclachlan, Boston, Mass., was on brief, for plaintiff, appellant.

Lawrence T. Bench with whom William E. Searson, III, Boston, Mass., was on brief, for defendants, appellees.

Before BREYER, Chief Judge, and CAMPBELL, Circuit Judge, and CAFFREY,* Senior District Judge.

* Of the District of Massachusetts, sitting by designation.

BREYER, Chief Judge.

In October 1985, the University of Massachusetts at Boston, after considerable investigation and debate, formally "censured" tenured Assistant Professor Anny Newman for "seriously negligent scholarship," amounting, it said, to "objective plagiarism." The University punished her by making her censure public and by disqualifying her for five years from serving as an administrator or a member of various academic boards.

Professor Newman then brought this federal civil-rights action, basically claiming that University officials deprived her of "liberty" or "property" without "due process of law." *See Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972); U.S. Const. amend. XIV, § 1; 42 U.S.C. § 1983. This court, on an earlier appeal, held that, at a minimum, the defendants enjoyed a "qualified immunity" from Professor Newman's federal civil-rights damage claims, for, in punishing her for plagiarism, they had violated no *"clearly established"* federal law. *Newman v. Massachusetts,* 884 F.2d 19 (1st Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990); *see generally Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985).

Subsequently, the district court entered summary judgment for the defendants on Professor Newman's remaining federal claim, namely her demand for an *injunction.* To support this demand, Professor Newman made the same basic argument, namely that the defendants deprived her of constitutionally protected "liberty" or "property" without "due process of law." But, the legal standard for assessing her argument is different. When a civil-rights plaintiff asks for *damages,* the defendants can assert a "qualified immunity" defense. They can argue: "Even if we acted unlawfully, we acted according to what we could then reasonably have thought was the law." *See, e.g., Goyco de Maldonado v. Rivera,* 849 F.2d 683, 686

(1st Cir.1988); *Lugo v. Alvarado,* 819 F.2d 5, 7 (1st Cir.1987). (And, that was the defense we previously upheld in this case.) When a civil-rights plaintiff asks for an *injunction,* however, the defendants cannot assert this "qualified immunity" defense—that they reasonably did not know their conduct was unlawful. Hence, defendants' right to summary judgment on the *injunction* demand depends upon what "due process" law *really* (and currently) *is,* not upon what the defendants might then reasonably have thought it. Hence, we must once again review the record, applying this stricter standard.

After reviewing Professor Newman's arguments, the record, and the law, we conclude that despite the more favorable standard, Professor Newman cannot prevail. The largely undisputed facts in the record show that the University provided her with all the "process" that is her "due." In reciting those facts, we view the record as favorably to Professor Newman as the law permits. *See* Fed.R.Civ.P. 56; *Greenburg v. Puerto Rico Maritime Shipping Auth.,* 835 F.2d 932, 934 (1st Cir.1987).

## I

### *Background*

1. *The "Plagiarism."* In 1983, Professor Newman published, in *Festschrift für Nikola R. Pribic* (Hieronymous Verlag, Neuried 1983), a thirteen-page article about a poem (called "Suze sina razmetnoga") by a 17th-century Croatian poet, Franjin Gundulić. One of Professor Newman's colleagues, Professor Diana Burgin, thought Newman might have copied parts of it from a 1952 book (cited in the article as a source) by Vsevolod Setschkareff, *Die Dichtungen Gundulićs und ihr poetischer Stil* (Atheneum Verlag, Bonn 1952). She brought her suspicions to the attention of the Russian Department's personnel committee. Professor Robert Spaethling, another member of the committee, after translating relevant Setschkareff passages from the German, found many similar passages in book and article.

Professor Newman's article, for example, contained the following descriptions (in English) of a series of lines quoted (in Croatian) from the poem:

This image of earthly beauty bars the sight of the supreme Good, throwing a shadow of depravity on the clean longing for Heaven: [quote].... Consequently, Gundulić paints us a picture reflecting his mystic train of thought; the sun as Divine Majesty illuminates all mankind, and His ray points to truth and heavenly justice: [quote] ... revealing itself to the sinner cloudlessly through the ray of self-recognition: [quote].... Thus the repentant sinner sees heaven's brilliant aura in contrast to earth's darkness: [quote].... A father's welcome symbolizing God's everlasting grace: [quote].... The world is superficial; the objects it admires most are like wax in the fire, smoke in the wind, snow under the sun, an arrow shot by a strong hand from a bow: [quote].... Life itself is nothing but agitated seas, a storm-tossed ship. [quote].... Man is a 'dried-up twig', whose salvation lies only in his humble penitence. Heaven's grace will make it bloom again, like a Phoenix rising from the ashes: [quote]....

Setschkareff's book refers to similar Gundulić quotations, and, in Spaethling's translation from the German, it says:

The earthly beauty is the cloud which bars us from seeing the highest "Ti si oblak, ki zastupa...." It throws a shadow on the pure longing for heaven (II, 11): ... and consequently the sun is the image of heavenly truth (III, 10), which through the ray of self-recognition (II, 18) allows the sinner to perceive its image without clouds.... Whatever the world values and holds dear is wax in the fire, smoke in the wind, snow before the sun.... an arrow shot by a strong hand, and it (the world) itself is only a burning sea, and a ship in the storm.... Man, however, after his enlightenment by heavenly grace, is a dry staff, which begins to green (III, 9), a phoenix rising from the ashes.

To take another example, at one point, Professor Newman's article says:

Gundulić sets Here as opposite to the Beyond with awesome force, and one is constantly aware of the contrast between Heaven and Earth. Good and evil appear again in the description of man's fate after death, Lament II, stanzas 48–52: [quote].... The good will find eternal blessedness in Paradise, while the evil will be damned in the darkness of a snake-infested Hell. Heightened antithesis can be found in Lament III, stanza 54, where the poet describes man's thanklessness to God: [quote]....

The Setschkareff book, as translated by Professor Spaethling, says:

Here (i.e., the earth) and There (i.e., the beyond) are placed in opposition to each other in sharpest distinction.... The poet, the person is seized with this recognition of the enormous opposition between earth and heaven. The antithesis between the good and the evil people and their fate is worked out in all details. (II, 48–52).... We find an accumulation of antitheses in Lament III, 54, where the deep ingratitude of man to God is to be described. [quote].

Spaethling found similarities of roughly this sort on about seven of the 13 pages of Professor Newman's article. Based on these similarities, personnel-committee members, in effect, charged Professor Newman with plagiarism.

Professor Newman replied that the similarities did not amount to plagiarism for several reasons. First, she said that most of the common passages simply reflected general knowledge among scholars in the field and did not require attribution. Second, she pointed out that many of the similarities consisted of paraphrases of the same lines of Croatian poetry and therefore had to resemble each other. Third, she added that her article essentially paraphrased her 1962 Harvard Master's thesis, which a noted scholar in the field had supervised and found adequate. (In fact, he had specifically told her to use Setschkareff's book as a model.) Fourth, she referred to the article's six footnotes, three of which cited to Setschkareff's book, and asked why she would have mentioned the

book in the article had she intended to plagiarize from it.

2. *The University's Procedures.* The University investigated the plagiarism controversy, and eventually decided what action to take, roughly as follows:

a. In late 1983, members of the personnel committee told the Dean of the College of Arts and Sciences about their suspicions. The Dean then met with Professor Newman and promised to take no action until he received her written response. She submitted her response in March 1984.

b. The Dean asked two Slavic-language scholars at other universities to review the article for plagiarism. After doing so, one wrote back that the article contained "exemplary instances of plagiarism." The other said that the work was "indebted to Dr. Setschkareff's major work considerably more than formally acknowledged," but that it would be difficult to show "conscious, deliberate and outright plagiarism," as the author might have suffered simply from "lapses in awareness." The Dean asked Professor Newman if she wished to respond. (She did not do so.)

c. The Dean formed an ad hoc committee of senior Arts and Sciences faculty (the "Knight Committee," after its chairman) to investigate further and recommend punishment if warranted. The committee held hearings on May 7 and 10, 1985. It permitted Professor Newman to challenge for cause any of the committee members. It permitted her to present evidence, to call witnesses, to crossexamine witnesses, and to bring a colleague to help her. Professor Newman submitted letters from six outside scholars of her choice, all of whom concluded that she did not plagiarize.

d. On May 23, 1985, the Knight Committee submitted its report to the Dean. It found that Newman had had no "conscious intent to deceive," but that her scholarship had been "negligent," and contained "an objective instance of plagiarism." It recommended "censure" and "no further ac-

tion." Subsequently, the Dean met with the committee members and discussed what the committee meant by "censure." The Chairman then wrote to the Dean that the "Committee did not mean to specify the particular form that the action of censure should take," but it should not include reduction of salary, demotion or termination.

e. The Dean asked Professor Newman to respond to the Knight Committee report. She submitted a response on June 7.

f. On July 1, the Dean recommended to the University Provost that the University "censure" Professor Newman, in essence, by adopting and making public the Knight Committee's findings, and by barring her from participating on certain academic committees (or holding administrative office) for five years. The Dean asked Professor Newman to respond. She did so, sending a letter to the Provost on July 19. The Provost, in effect, adopted the Dean's recommendations and repeated them to the Chancellor. Professor Newman repeated her side of the story to the Chancellor. And, the Chancellor then adopted, and ordered implemented, the Provost's recommendations.

Subsequently, Professor Newman brought this lawsuit. Eventually, the district court granted summary judgment in the defendants' favor. And, this appeal followed.

## II

### *Due Process of Law*

■ The basic legal question before us is whether the record permits a finding that the University (1) deprived Professor Newman of "life, liberty or property," (2) without "due process of law." We shall assume, for the sake of argument, that, in censuring Professor Newman publicly and barring her from administrative positions, the University deprived her of "liberty" or "property." *See Paul v. Davis*, 424 U.S. 693, 701, 712, 96 S.Ct. 1155, 1160, 1166, 47 L.Ed.2d 405 (1976) (no protected "liberty" interest in "reputation" unless the loss is

accompanied by deprivation of "a right previously held under state law," such as an interest in employment). Nonetheless, summary judgment for the defendants is legally proper, for the virtually undisputed record facts make clear that the University provided Professor Newman with all the "process" that the Constitution requires, and more.

Our brief description of that process shows that, at each stage of the proceedings, the University afforded Professor Newman an opportunity to present her side of the story, it permitted her to challenge decision makers for bias, it permitted her to call witnesses, it permitted her to see, and to criticize, the evidence against her, and it permitted her to see all tentative recommendations, and to argue against them, before they became final. In short, it provided Professor Newman with an impressive array of due process safeguards—notice of proposed action, a trial-type hearing in which she was given an opportunity to present proofs and arguments and to challenge the proofs and arguments of others, all before neutral decision makers, who prepared written findings of fact and reasons for their decision. *See generally* Friendly, *"Some Kind of Hearing"*, 123 U.Pa.L.Rev. 1267, 1279–95 (1975). In light of the competing interests at stake (for Newman and for the University), and in light of the slight probability that additional procedural safeguards would have resulted in a better decision, *see Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), we find this, constitutionally speaking, more than sufficient. *Cf., e.g., Agarwal v. Regents of Univ. of Minn.*, 788 F.2d 504, 508 (8th Cir.1986) (in plagiarism hearing, due process was satisfied by 1) notice of reasons for termination of tenure, 2) notice of names of accusers, 3) opportunity to present evidence in defense, 4) before an impartial tribunal).

Nonetheless, Professor Newman argues on appeal that a thorough reading of the record reveals proceedings that, in reality, were far less fair than they might seem on the surface. We have, therefore, read the record with care, and we have considered Professor Newman's five detailed arguments that she believes show fundamental unfairness in the proceedings. We are unconvinced by these arguments. We shall briefly explain why those five arguments, taken separately or together, do not show that the proceedings failed to meet constitutional standards of basic fairness.

1. *The "Red Book" Procedures.* Professor Newman points out that the University did not follow its ordinary procedures for "major personnel actions" listed in a manual called the "Red Book." She notes that the "Red Book" procedures differed in certain respects from those followed in her case. (She alleges that under "Red Book" procedures, she would have been entitled, among other things, to compile the file to be considered at all levels of the decision-making process, and that the fact that her "Refutation" was not before the initial personnel-committee members who first brought the charges or before the "outside scholars" violated this right.) And, she argues that the deviation violated "due process" principles.

 The Due Process Clause of the Constitution, however, does not require the University to follow any specific set of detailed procedures as long as the procedures the University actually follows are basically fair ones (which in this case they were). *See Hill v. Trustees of Ind. Univ.*, 537 F.2d 248, 252 (7th Cir.1976) (fact that Student Code of Conduct was not followed in disposing of plagiarism charge against student did not in itself constitute due process violation); *cf. Davis v. Scherer*, 468 U.S. 183, 193 n. 11, 104 S.Ct. 3012, 3018 n. 11, 82 L.Ed.2d 139 (1984); *Board of Curators v. Horowitz*, 435 U.S. 78, 92 n. 8, 98 S.Ct. 948, 956 n. 8, 55 L.Ed.2d 124 (1978). Whether the University was, or was not, supposed to apply its "Red Book" procedures in this case is a matter of University rule or policy, not of federal constitutional law. In any event, the record shows that Professor Newman waived the Red Book's procedures. At her December 19 meeting with the Dean, she argued that the "Red Book" procedures did *not* apply to her case; and, in a March 14 letter to the Dean,

she added that she "agree[d]" that "there were no mechanisms provided by University governance to resolve the kind of charge levied against me...."

2. *The Refusal to Submit the "Refutation" to Outside Experts.* As we mentioned above, when the Dean initially heard about the plagiarism charges, before deciding whether to take further action, he sent a copy of Professor Newman's article and her Master's thesis to two outside experts. But, he did not submit Professor Newman's "Refutation" to those experts. He wrote Professor Newman:

Upon receipt of the responses from the outside scholars, you will be informed of the identity of the scholars selected, provided with copies of their letters, and given an opportunity to make any comments you wish. At this point you will have a full opportunity to refute any questions raised or charges made in this entire matter. *Since the full nature of these questions and possible charges will not be clear until we have received the report of the outside reviewers, I shall not provide the reviewers now with a copy of the refutation you submitted to me on March 14.* All your comments will be taken into consideration before the administration takes any further steps, whether that step is to conclude that the charges of plagiarism are baseless or to conclude that the charges require further action.

(Emphasis added.)

Professor Newman argues that the Dean's decision not to send a copy of her "Refutation" to the outside experts was fundamentally unfair, for that refusal prevented the outside experts from adequately understanding her perspective until it was too late—until they had made up their minds—after which point her case, she says, was doomed. The experts would not likely change their minds once made up, nor would a group of University officials likely take a different point of view, no matter how often or how thoroughly they listened to Professor Newman.

The difficulty with this argument is that it proves far too much. The Constitution does not mandate an opportunity to present proofs, arguments, and refutations to *any* group of people with the power to influence an important decision about life, liberty or property. The Constitution does not require a grand jury to call a potential defendant or the witnesses to whom a potential defendant refers, before proceeding to indict. *See, e.g., United States v. Ruiz,* 894 F.2d 501, 505 (2d Cir. 1990); *United States v. Smith,* 552 F.2d 257, 261 (8th Cir.1977). Nor does it require an agency investigator to consider all of a private party's excuses before recommending further proceedings. For that matter, it does not require an expert witness for one party to hear the other side before testifying. The Constitution does not require every procedural protection that might help; it simply requires that a private person have a basically fair opportunity to convince the *decision maker,* by presenting proofs and arguments and evidence and replies to the arguments of others. Here, the decision makers—the Knight Committee, the Dean, the Provost, and the Chancellor—provided Professor Newman with a full opportunity to present her side of the argument before they reached a final decision. Indeed, in his charge to the Knight Committee, the Dean stated that "Professor Newman has been assured that she will be given an opportunity to appear before the Committee; to cross-examine any witnesses called by the Committee; and to call witnesses on her own behalf." The record indicates that the committee lived up to this charge, and, in fact, it later sent Professor Newman's "Refutation" to the two scholars who initially reviewed her article to see if it led to any significant change of mind. (It did not.)

3. *Arbitrary Action.* Professor Newman argues that the University's final decision to punish her was itself so arbitrary that it violated the Constitution's Due Process Clause. In evaluating her claim, we recognize that, unless a fundamental liberty protected elsewhere in the Constitution (*e.g.,* free speech) is at stake, the primary concern of the due process clause is

*procedure,* not the substantive merits of a decision. The Supreme Court has twice said that it would *assume* that an individual, in respect to "property," has a Constitutional ("due process") right to be "free from arbitrary state action." *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 223, 106 S.Ct. 507, 512, 106 S.Ct. 507 (1985); *see Board of Curators v. Horowitz,* 435 U.S. 78, 91–92, 98 S.Ct. 948, 955–956, 55 L.Ed.2d 124 (1978). But it has not explicitly *held* that such a right exists, nor has it described its contours. (Would it mean, for example, that federal courts should review a large class of *state* administrative actions as if they were *federal* actions being reviewed for compliance with the Administrative Procedure Act's requirement that administrative decisions not be arbitrary? *See* APA § 10(e)(2)(A), 5 U.S.C. § 706(2)(A) (instructing the federal courts to set aside agency action that is "arbitrary, capricious," or "an abuse of discretion").)

The Supreme Court, nonetheless, has given us a rather specific instruction applicable in this case. It has said (*"assum[ing]* ... a substantive right under the Due Process Clause [to be] ... free from arbitrary state action," *Ewing,* 474 U.S. at 223, 106 S.Ct. at 512 (emphasis added)):

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment. Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Id.* at 225, 106 S.Ct. at 513 (footnote omitted). Applying this standard to each of Professor Newman's two claims of "arbitrary" action, we can find no violation of the Constitution.

First, Professor Newman says that the University could not reasonably find that she plagiarized, for the Knight Committee Report effectively conceded that she did not *intend* to deceive. At worst, she simply used her 1962 Master's thesis when writing her 1983 article, and she assumed that the thesis was problem-free. She argues that the finding of plagiarism is arbitrary because several academic sources define plagiarism as involving an "intent to deceive;" and the University concedes that it has not shown such an intent.

Other academic sources, however, define plagiarism without reference to intent. The source used by the Knight Committee, for example, says that

> to plagiarize is to give the impression that you have written or thought something that you have in fact borrowed from another.

*MLA Handbook for Writers of Research Papers, Theses, and Dissertations* 4 (New York, Modern Language Ass'n 1977). This source suggests that one can plagiarize through negligence or recklessness without intent to deceive. Moreover, the University did not characterize Professor Newman's subjective state of mind. It said she was guilty of "objective plagiarism," and "seriously negligent scholarship." Finally, the record reflects a serious effort by the Knight Committee and the Administration to investigate, to hear all sides, and to evaluate. We do not believe any reasonable reader of the record could conclude that "the person or committee responsible did not actually exercise professional judgment." *Ewing,* 474 U.S. at 225, 106 S.Ct. at 513.

Second, Professor Newman argues that the Dean, Provost and Chancellor acted arbitrarily when they went beyond the Knight Committee's punishment recommendation that she be "censured," but that "no further action be taken." Professor Newman has not shown (and nothing in the record suggests) that it was a "substantial departure from academic norms," however, to make her censure public or to bar her from holding committee assignments and administrative positions for five years. Nor does the record permit a conclusion that the University officials responsible for assessing that punishment lacked the legal power to do so. And, the record makes clear that Professor Newman was given an opportunity not only to tell her story to the

decision makers, but also to comment upon the punishments recommended.

Third, Professor Newman argues that all the factors mentioned previously—the failure to follow "Red Book" procedures, the failure to send her "Refutation" to the outside experts, the finding of plagiarism without a showing of intent to deceive, and the punishment—taken together show an improper motive, a kind of vendetta against her, and to punish her as a result of such a vendetta is "not actually [to] exercise professional judgment," and hence, constitutionally speaking, "arbitrary." The short and conclusive answer to this claim is that, in our view, no reasonable trier of fact could find, on the basis of this record, that the responsible University authorities, the Chancellor, the Provost, the Dean or the Knight Committee, engaged in a vendetta, or acted for some other, similarly improper, reason. That conclusion does not reasonably follow from the four circumstances mentioned, even when these are embellished with various subsidiary details that the record contains. Regardless, we have held that where *stated* reasons adequately support an adverse personnel action, that action is not "arbitrary," whether or not a plaintiff might demonstrate a further "real" *unstated* and arbitrary reason for the action. *See Drown v. Portsmouth School Dist.*, 451 F.2d 1106, 1108 (1st Cir. 1971). A contrary holding would unduly inhibit administrative decision making, for it would permit endless exploration of a decision maker's "true" state of mind in instances where perfectly good reasons exist for taking an administrative action. *Cf. Morgan v. United States*, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938) (forbidding exploration of state of mind of decision maker).

In sum, the University has not deprived Professor Newman of her "liberty" or "property" without "due process of law."

## III

### The Pendent Claims

Professor Newman brought two pendent state-law claims against one of the defendants, Professor Burgin, whom, Newman says, slandered her and intentionally interfered with her professional, economic relationships. The district court, when it granted defendants' motion for summary judgment on the federal claims, dismissed these state claims. Plaintiff appeals that dismissal.

■■■ The power of a federal court to hear and to determine state-law claims in nondiversity cases depends upon the presence of at least one "substantial" federal claim in the lawsuit. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The district court has considerable authority whether or not to exercise this power, in light of such considerations as judicial economy, convenience, fairness to litigants, and comity. *See Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). We review its refusal to exercise jurisdiction over a pendent claim only to determine whether it acted outside the scope of its broad, discretionary, legal power. *See, e.g., McCaffrey v. Rex Motor Transp., Inc.*, 672 F.2d 246, 250 (1st Cir.1982).

■■■ Professor Newman argues that the district court abused its discretionary powers here because state statutes of limitations now prevent her from bringing her actions in state court. *See* Mass.Gen.L. ch. 260 §§ 2A, 4 (1987). She says that dismissal does not simply relegate her to state court, but prevents her from bringing her actions at all.

■■■ We recognize that expiration of a state limitations period is an important factor for a district court to consider when deciding whether or not to dismiss a pendent claim. *See, e.g., Notrica v. Board of Supervisors*, 925 F.2d 1211, 1214–15 (9th Cir.1991); *see generally* 3A J. Moore, J. Lucas & G. Grotheer, *Moore's Federal Practice* ¶ 18.07[1.–3], at 18–57 & n. 43 (1990); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3567.1, at 127–32 & n. 17 (1984). And, three circuits seem to have held that a district court *cannot* dismiss a pendent claim where the limitations period has ex-

pired. *See L.A. Draper & Son v. Wheelab-rator-Frye, Inc.*, 735 F.2d 414, 427–30 (11th Cir.1984); *Henson v. Columbus Bank and Trust Co.*, 651 F.2d 320, 325 (5th Cir.1981) (per curiam); *O'Brien v. Continental Ill. Nat'l Bank and Trust Co.*, 593 F.2d 54, 65 (7th Cir.1979). Nonetheless, we believe the district court's determination is lawful for two reasons.

First, when a district court dismisses all federal claims before trial, it normally will dismiss pendent state actions as well. As the Supreme Court has pointed out:

> in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Cohill*, 484 U.S. at 350 n. 7, 108 S.Ct. at 619 n. 7 (1988). Since "pendent" claims, by definition, consist of state matters over which Congress did *not* grant federal courts independent jurisdiction, it is not surprising that federal courts hesitate to hear them when, stripped of their federal support prior to any helpful, related, factual or legal determination, they stand before the court both pristine and alone.

Second, our examination of relevant state law suggests only a *possibility*—a *risk*—that Massachusetts procedural law would prevent Professor Newman from bringing her case. A Massachusetts savings statute says that:

> If an action duly commenced within the time [allowed by the statute of limitations] is dismissed for ... any ... matter of form, ... the plaintiff ... may commence a new action for the same cause within one year after the dismissal....

Mass.Gen.L. ch. 260, § 32 (1987). And, the Massachusetts Supreme Judicial Court, in deciding whether a dismissal was for a "matter of form" (thereby saving the action) has considered certain functional features of the case. Thus, in "saving" an action mistakenly brought in Superior Court (which lacked the jurisdiction given exclusively to the District Court), the Supreme Judicial Court pointed out that the plaintiff had not filed its action in the wrong court intentionally, or through gross negligence, and its first filing had "notified the defendant that resort was to be made to the courts." *Loomer v. Dionne*, 338 Mass. 348, 351, 155 N.E.2d 411, 413 (1959). *See also Woods v. Houghton*, 67 Mass. (1 Gray) 580, 583 (1854) (action brought in wrong county). Conversely, when a plaintiff filed a case against the wrong defendant, or failed to serve the defendant properly with process—thus, in principle, *failing* to "notif[y]" the defendant about the case—the SJC has said the dismissal did *not* involve a "matter of form" and that the statute, therefore, did *not* save the action. *See Gifford v. Spehr*, 358 Mass. 658, 663, 266 N.E.2d 657, 661 (1971) (improper service); *Jordan v. Commissioners of Bristol County*, 268 Mass. 329, 332, 167 N.E. 652, 654 (1929) (wrong defendant).

Here, of course, the federal court dismissal was not related to the merits of the state claims; the dismissal is, in a broad sense, jurisdictionally related (as federal law entrusts the exercise of jurisdictional power in this instance to the discretion of the district court); the defendant had proper notice that "resort was to be made to the courts;" and the plaintiff, in filing the claim in federal court, was not negligent or otherwise at fault. These features of the case suggest that the statute saves the plaintiff's case and she can bring it in the state courts. On the other hand, the Supreme Judicial Court has not decided a question quite like this one, and we must therefore agree with the intermediate Massachusetts court that (speaking through a former Justice of the Supreme Judicial Court) wrote that the matter is "not free from doubt." *Granahan v. Commonwealth*, 19 Mass.App.Ct. 617, 620 n. 6, 476 N.E.2d 266, 268 n. 6 (Cutter, J.), *review denied*, 395 Mass. 1102, 480 N.E.2d 24 (1985).

Ultimately, then, this is not a case where plaintiff faces a time bar; it is a case in which she faces only a legal risk. It is a case where a federal judge might reasonably believe, but not feel certain, that she can pursue her state claim in a state court.

Given 1) the lack of a supporting federal claim, 2) the normal practice of, and reasons for, dismissing pendent claims in such circumstances, and 3) the nature and scope of the state-law procedural "risk," we find that the district court's decision to dismiss was lawful. We do not believe it unfair to impose upon plaintiff, in the circumstances here present, the burden, and risks, of litigating the time-bar issue in the state courts along with the other issues she will there have to litigate and legal risks of loss she will there run. We are not prepared to say that, where other features of a case support dismissal, a federal district court (to dismiss the claim) also must be *certain* a plaintiff with pendent state-law claims can proceed in state court. *Cf. Huffman v. Hains*, 865 F.2d 920, 923–25 (7th Cir.1989) (where there was no "serious doubt" that state savings statute would apply to plaintiff's state-law claim, district court did not err in dismissing state claim after it had dismissed all federal claims). And, here, in the absence of any such absolute rule, we can find no legal basis for setting aside the district court's discretionary determination.

For these reasons, the judgment of the district court is

*Affirmed.*