Ramon M. **SUAREZ**, et al., Plaintiffs,

v.

**PUEBLO INTERNATIONAL, INC.**, et al., Defendants.

No. Civ.97–1467(SEC).

United States District Court, D. Puerto Rico.

Oct. 1, 1999.

---

Harry Anduze–Montano, San Juan, PR, for plaintiffs.

Lidia Gonzalez–Figueroa, Munoz, Bonetta, Gonzalez, Benitez & Peral, San Juan, PR, Victor P. Miranda–Corrada, San Juan, PR, for defendants.

## OPINION AND ORDER

CASELLAS, District Judge.

Pending before the Court is defendants CaribAd, Inc. d/b/a The AdTeam ("CaribAd") and Pueblo International, Inc. ("Pueblo")'s motion for summary judgment **(Docket # 107)**, which was duly opposed by plaintiffs **(Docket # 117)**. Defendants argue that summary judgment should be entered in their favor because plaintiffs have failed to establish a *prima facie* case of age discrimination actionable under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., as required by the Supreme Court case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Defendants further maintain that plaintiffs' state law merits also warrant dismissal as they fail to state a cause of action. Upon examination of the relevant facts, the applicable law, and the arguments advanced by both parties, the Court finds that defendants' motion for summary judgment **(Docket # 117)** should be **GRANTED.**

### Summary Judgment Standard

The First Circuit has stated that:

[s]ummary judgment has a special niche in civil litigation. Its role is 'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.' *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.

1992). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money and permitting courts to husband scarce judicial resources.

*McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). According to Fed.R.Civ.P. 56(c), summary judgment should issue whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28 (1st Cir.1994). It is not enough to conjure up an alleged factual dispute between the parties; to defeat summary judgment, there must exist a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

For a dispute to be "genuine", there must be sufficient evidence for a reasonable trier of facts to resolve the issue in favor of the non-moving party. *U.S. v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992). *See also, Boston Athletic Assn. v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989). By like token, "material" means that the fact is one that might affect the outcome of the suit under the governing law. *Morris v. Government Development Bank of Puerto Rico,* 27 F.3d 746, 748 (1st Cir.1994).

In determining whether to grant a summary judgment, the Court may not, however, weigh the evidence. *Casas Office Machines, Inc. v. Mita Copystar America, Inc.,* 42 F.3d 668 (1st Cir.1994) Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Id.citing Greenburg v. Puerto Rico Maritime Shipping Authority,* 835 F.2d 932, 936 (1st Cir.1987). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. *Casas Office Machines,* 42 F.3d at 684.

In ADEA cases, once a defendant files a motion for summary judgment, the issue before the Court turns " 'not [on] whether [the plaintiff] was in fact fired because of his age, which remains to be determined at trial, but [on] whether [the question of whether he] was fired because of his age, is genuinely contestable'." *Maldonado-Maldonado v. Pantasia Mfg. Corp.,* 956 F.Supp. 73 (D.P.R.1997), *quoting Shager v. Upjohn Co.,* 913 F.2d 398, 403 (7th Cir. 1990).

Given the foregoing, we must examine the facts, as presented by the parties, to determine whether there is any genuine issue of material fact involved.

**Factual Background**

Defendant CaribAd is an advertising agency that is a wholly-owned subsidiary of Pueblo. As such, it provides advertising services to Pueblo's various divisions, including the Puerto Rico Division and the Blockbuster Division of Pueblo ("Blockbuster"). Plaintiff Ramón M. Suárez ("plaintiff") became the President of CaribAd on April 19, 1989 and held that position until his resignation on September 12, 1996. As President of CaribAd, plaintiff reported directly to the Chairman of the Board of Directors and Chief Executive Officer of Pueblo, William T. Keon III ("Keon"), who was also the President of Pueblo. At the time of his resignation, plaintiff was fifty-nine (59) years old and earned a yearly salary of one hundred ninety-four thousand fifty-four dollars and zero cents (194,054.00).

Keon was appointed the President of Pueblo on October 18, 1995, and on or around December of 1995, he also became Chairman of the Board of Directors. Mr. Edwin Pérez ("Pérez") was appointed President of Pueblo's Puerto Rico Division in March of 1996, after the former president, Mr. Héctor Quiñones ("Quiñones"),

resigned. Prior to his appointment as President of Pueblo's Puerto Rico Division, Pérez had been the President of Amigo Supermarkets, one of Pueblo's main competitors in Puerto Rico, where he had enjoyed much success in building up the company.

In 1993, the Organización Diego Cisneros ("ODC") acquired all the holdings and interests of Pueblo International, Inc. During the summer of 1995, the ODC attempted to sell Pueblo in an effort to avoid further losses. However, in December of 1995 it was determined that improving the business through a management program would create more value than could be acquired through a sale.

Defendants assert, and plaintiffs do not contest, that Keon became President of Pueblo at a time when it was going through a very difficult economic situation which was compounded by losses in its market share in both Puerto Rico and the United States as well as by an inability to service its debt. Thus, Pueblo was in need of a major overhaul in its operations in order for the same to become a profitable company once again.

Among the first actions taken by Keon upon his arrival at Pueblo was the institution of company-wide manpower hiring freeze and reduction of labor overhead. That was not enough to solve the company's economic problems and the Pueblo Xtra stores in Florida had to be closed. The hiring freeze had to be continued past April of 1996 as Pueblo's economic problems persisted.

Keon avers that in furtherance of the objectives set by the Pueblo stockholders to maximize profitability at all levels of the Company, beginning in November or December of 1995, Keon required that CaribAd aggressively develop the third party business; at that time, about 97% of CaribAd's revenues came from the Pueblo and Blockbuster accounts. Furthermore, at the end of October, 1995, Keon determined that an overhaul of CaribAd's creative element was required since, in his opinion,

Pueblo's advertising program was outdated.

As part of the revamping process of the advertising, Keon determined that he had to get personally involved in all aspects of Pueblo's advertising. To that end, he continuously held conferences with plaintiff and Mr. Román Mayer ("Mayer"), who acted as the Creative Director for CaribAd, to discuss the recovery plan for Pueblo.

On November 1, 1995 Keon and Quiñones met with plaintiff to inform him that the quality of the product generated by CaribAd's creative staff needed to improve. This became a source of contention between Keon and plaintiff, as on the several occasions that this was brought to plaintiff's attention, plaintiff insisted that everything was fine and that he was happy with the in-house creative person at the agency.

When Pérez assumed the presidency of Pueblo's Puerto Rico Division, he determined that in order for his tenure at Pueblo to be as successful as it was at Amigo, he would take a hands-on approach in Pueblo's marketing and advertising strategies.

Keon, Pérez, and Filiberto Berríos ("Berríos"), President of Blockbuster, a division of Pueblo International, were all in agreement that the creative output of CaribAd needed to improve and that in order for that to occur, outside creative talent needed to be brought in. Defendants assert that Berríos was dissatisfied with CaribAd's work for Blockbuster and due to that fact, retained the services of the Badillo Nazca advertising agency to do part of Blockbuster's advertising. After Pueblo, Blockbuster was CaribAd's largest client. By plaintiff's own admissions, however, he insisted that he was happy with the creative personnel at CaribAd. Keon, Pérez, and Berríos all aver that they felt that plaintiff refused to accept the basic fact that they, as CaribAd's biggest clients, and not the agency head, were the ones to

determine whether CaribAd's creative output was up to par.

When Pueblo was bought by ODC in 1993, the Cisneros group would periodically hold meetings with the senior management of Pueblo's subsidiaries and divisions; these were originally called Committee Meetings, and were later called Operating Meetings. At these meetings, senior management would meet with the President to discuss business-related matters. Plaintiff, in his position of President of CaribAd, was invited to participate in said meetings.

On March 20, 1996 Keon notified the senior management staff that an Operating Meeting would be held on March 26, 1996, and that among the items to be discussed would be the fiscal year 1996 results and the fiscal year 1997 budgets. At the March 26, 1996 meeting Keon discussed the challenges facing Pueblo for the coming fiscal year. Once again, Keon, Pérez, and Berríos discussed with plaintiff the fact that they were unhappy with the creative product being prepared at CaribAd, and once again plaintiff disagreed with that assessment.

In spite of his disagreement with Pueblo's upper management's assessment, plaintiff was informed by Keon that in order to increase the revenues and results for fiscal year 1997, they needed CaribAd's full support, and that in order for that to occur, outside creative personnel would have to be retained. Mr. Román Mayer, CaribAd's Creative Director, agreed with this necessity.

On March 28, 1996, Keon sent plaintiff a letter confirming the decisions that had been taken during the Operating Meeting. In that letter, Keon reminded plaintiff that as CaribAd's clients, they were the ones to evaluate whether CaribAd's output was meeting their expectations for quality. In his deposition, plaintiff testified that even though he knew that other people needed to be brought in to CaribAd, he interpreted Keon's March 28, 1996 letter as a dismissal of CaribAd and of him as its President. He interpreted that this letter constituted an act of age discrimination against him, which by his own admissions he had not perceived before this moment.

Sometime in March of 1996, during a press conference given by Pérez upon being named President of Pueblo's Puerto Rico Division he stated that the Company needed "new blood" in order to regain its competitive edge in the business. He avers that at the conference, he stressed the fact that the conduct of business needed to change because the way business was conducted in the past would not necessarily work under the present business environment. He further avers that his statement was a general one, directed at the press, and not at plaintiff, and referred to Pueblo's Puerto Rico Division, and not CaribAd.

Plaintiff's wife, Ms. Helene Pesante de Suárez, avers in her statement under penalty of perjury that in an activity held at the Caribe Hilton Hotel in early 1996, Berríos, Blockbuster's President, made comments to her regarding how plaintiff needed to dye his white hair, how he was an old man, and how he should retire.

Beginning in May of 1996, Keon decided that the format for the Operating Meetings would change because since he was traveling to Puerto Rico on a much more frequent basis than his predecessor, it no longer made any sense to hold meetings which the entire Puerto Rico-based management would attend. Thus, he initially changed the format to reduce the number of executives present at any given meeting; executives would be called into the meeting to discuss the issues that pertained to them and then they would be excused from the rest of the meeting so that they could attend pressing business at their respective offices. This cut down on the number of executives that attended meetings, as well as the amount of time that each of them spent in the meeting. These changes applied to all Pueblo executives, and plaintiff was not singled out in this change in any way. Plaintiff does not

present any evidence to rebut Pueblo's proffered reason that the changes stemmed from a change in management style, rather than an attempt to discriminate against plaintiff on the basis of age.

In early 1996, Keon decided to discontinue the Operating Meeting format altogether, in favor of one-on-one meetings with executives regarding their areas of operation. Plaintiff has averred that this format change was also designed to discriminate against him on the basis of age. Furthermore, he asserts that having to wait outside of Keon's office if another executive's meeting ran late was intended to humiliate and also constitutes an act of age discrimination. Again, defendants present unrebutted evidence that the changes in the meeting formats applied equally to all Pueblo executives and in no way were designed to single out, humiliate, or punish plaintiff.

Because it was decided that outside talent needed to be brought in to provide creative assistance to CaribAd, plaintiff arranged for five or six agencies to make presentations to Pueblo, Blockbuster, and CaribAd management. Plaintiff and Mayer were in agreement that Sajo & García was the best choice to provide those services and pursuant to that recommendation, they were retained by CaribAd as outside creative talent.

Keon avers that in response to complaints he received from managers at Pueblo and Blockbuster, he decided that major changes needed to be implemented in the manner in which CaribAd handled the Pueblo and Blockbuster accounts, as well as the manner that it serviced third party accounts. To that end, he claims that he began to consider the possibility of reconfiguring CaribAd so that it would have two offices, one at a new location in Hato Rey and another at Pueblo's offices in Carolina, splitting the agency's employees between the two offices. According to Keon, plaintiff was supposed to have offices at both locations, a fact which plaintiff asserts is untrue because the office in Hato Rey designed to create third party business was a ruse to isolate him and that someone else was meant to run the new office at Pueblo's facilities.

Keon requested that plaintiff prepare a relocation plan detailing the dual structure he was envisioning for CaribAd. This is one of the actions taken by Pueblo management to which plaintiff points as evidence of discriminatory animus against him on the basis of age. According to plaintiff, this order was humiliating and constituted an act of age discrimination because Keon requested the plan at the last minute, to be prepared virtually overnight. Plaintiff argues that this was an inappropriate request because he was not being allowed sufficient time to complete his work, and he also states that requesting him to work overtime was part of Keon's discriminatory treatment against him.

On the contrary, defendants aver that the request for a relocation plan was merely a business decision related to an issue which had been discussed in the past with plaintiff and of which he was aware. They argue that given the fact that plaintiff was a highly compensated executive, who earned $194,000 a year, Keon expected that he would spend the time necessary to respond to the request, even if that entailed working overtime. They state that this was an issue of work ethic which was expected of all Pueblo executives, and had nothing to do with plaintiff's age. According to plaintiff's deposition, he resented having to prepare the relocation plan because, in his opinion, everything at CaribAd was working well and Keon's proposal would not work.

Defendants state that the relocation plan was planned for two reasons. First, Keon thought that the plan was important in order for CaribAd to expand and provide better service to its principal clients, Pueblo and Blockbuster, and to bring in new business. To that end, one office would be located in the second floor of the Blockbus-

ter Piñero store at a sixty percent savings for the company; the other office, designated to bring in third party business, would be located at a different building in Hato Rey. The current offices were located at Nacional Plaza Building, where the rent was approximately $72,000.00. Defendants present a memorandum in which Keon informs plaintiff that he will have offices in both locations so that he could be able to supervise his employees at both locations.

Second, as mentioned above, defendants aver that CaribAd's offices were being moved from the Nacional Plaza Building because the rent at that location was too high and it made business sense to move to a less expensive location.

Plaintiff counters these proffered reasons by alleging that despite defendants' assertions that he was to have an office at both locations, in fact he was only to have an office at the new Hato Rey location, where he was going to be left without employees to supervise and would only have a receptionist. However, there is no evidence that this was to be the case, and because plaintiff left CaribAd before the move took place, there is no proof that this move was meant to isolate plaintiff. Plaintiff argues that this move toward two offices was merely a sham to isolate him from his CaribAd employees, and that he would be virtually useless at the Hato Rey office; he avers as evidence that the split in the offices was a sham to isolate him the fact that after he resigned all CaribAd employees were moved to the new offices, and no one stayed behind in Hato Rey.

Keon assigned plaintiff the task of organizing a luncheon in which Keon would inform them of the new business plan for CaribAd, including the relocation of the offices to Carolina. The luncheon took place on June 13, 1996, which was also the last day plaintiff worked at CaribAd. The next day, June 14, 1996, plaintiff went on sick leave. On July 3, 1996 plaintiff submitted a medical certificate stating that he should not return to work for two weeks;

he also submitted a request for a thirty-day vacation commencing on July 15 through August 27, 1996.

On July 17, 1996 Keon sent plaintiff a letter requesting that at the end of his leave he return to work. In that letter, Keon explained that plaintiff was needed in order to implement CaribAd's restructuring objectives. Furthermore, the letter stated that Ms. Ivonne Gómez, executive for third party development, had resigned, and that plaintiff needed to retain another person for the position of New Business Development Director. On July 30, 1996, not having received any response from plaintiff, Keon sent another letter requesting that plaintiff return to work as soon as possible, and stating that he had tried, unsuccessfully, to get into touch with plaintiff via the telephone. In his deposition testimony, plaintiff has averred that these letters from Keon, as well as "get well" flower arrangements and fruit baskets sent by Keon, were all part of his strategy of harassment and age discrimination.

During plaintiff's leave, his duties were divided between Ms. Lourdes "Milly" Hernández, Associate Creative Director, and Ramón Lloveras, Esq. They assumed the day-to-day affairs of the agency, on top of the duties associated with their respective positions. Between August and September of 1996, employees were relocated to the new Carolina offices as had been previously announced.

The plan was for plaintiff, his secretary, and the New Business Development Director to temporarily stay at the old offices at Nacional Plaza until the new offices were completed on the second floor of the Hato Rey Blockbuster store. After the resignation of Ivonne Gómez as account executive for third party business development on July of 1996, and because plaintiff was on sick leave since June of 1996, Keon began searching for a New Business Development Director. Mr. Aníbal García was interviewed, an offer was made to him

on November 12, 1996, and he assumed the position on December 9, 1996.

On September 12, 1996 plaintiff's attorney informed Keon that plaintiff would not be returning to work. Keon avers that in spite of this, he decided to allow plaintiff's sick leave to expire in order to give him an opportunity to change his mind and return to work. However, by December 4, 1996 it was evident that plaintiff would not be returning to his duties after a six-month absence, and he was officially notified of his termination as President of CaribAd. Immediately thereafter, Keon assumed the title and responsibilities of President of CaribAd, a position he still holds; Aníbal García then began assisting Mr. Keon. On or around early summer of 1997, García assumed the title of Managing Director and New Business Development Manager of CaribAd.

Plaintiff also presents evidence that subsequent to his departure from CaribAd, he was depressed and had to undergo extensive psychiatric treatment to deal with the condition. However, we shall not delve into the issue of post-employment psychiatric treatment as said evidence is only relevant to the determination of damages, not to the issue of whether plaintiff was the victim of age discrimination while he was at CaribAd.

### Applicable Law and Analysis—Plaintiff fails to establish a prima facie case under ADEA

■ The Age Discrimination in Employment Act ("ADEA") provides that "it shall be unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). The First Circuit has established that plaintiffs in ADEA discrimination lawsuits "bear the ultimate burden of proving that their ages were the determinative factor in their discharge, 'that is that [they] would not have been fired but for [their] age.'" *Pages–Cahue v. Iberia Lineas Aereas de Espana*, 82 F.3d 533, 536 (1st Cir.1996), quoting *LeBlanc v. Great American Insurance*, 6 F.3d 836, 841 (1st Cir.1993). In some cases, plaintiff will have enough direct or "smoking gun" evidence to establish discrimination without more. Most likely, however, plaintiff will possess little overt evidence of discrimination, and will have to rely on the much utilized burden-shifting standard enunciated in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). *Pages–Cahue*, 82 F.3d at 536. *See also Serrano–Cruz v. DFI Puerto Rico*, 109 F.3d 23 (1st Cir.1997).

Under the standard first set forth in *McDonnell Douglas*, and later adapted to cases filed under the ADEA, plaintiff may establish a *prima facie* case by showing "(1) that he or she fell within the ADEA's protected age group—that is, more than forty years of age; (2) that he or she met [the employer's] legitimate performance expectations; (3) that he or she experienced [an] adverse employment action; and (4) that [the employer] did not treat age neutrally or retained younger persons in the same position." *Pages–Cahue*, 82 F.3d at 536.

■ The First Circuit has established that evidence of an employee's long history at the employer's business, and his or her rise from a low-level to a managerial position, are sufficient to support an inference that the employee's job performance was adequate to meet an employer's needs, even when the evidence did not extend all the way to the time of his discharge. *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 673 (1st Cir.1996). Moreover, as to the fourth requirement, the United States Supreme Court has recently established that a plaintiff does not have to be replaced by someone outside of the protected class in order to make a prima facie case of discrimination. "The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of his age." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433

(1996). Since the ADEA "prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than the fact that the plaintiff was replaced by someone outside the protected class." *Id.*

In the present case, it is undisputed that plaintiff fell squarely within the protected age group at the time of the allegedly adverse action against him, when he was 59 years old. As to the second prong of the test, that the employee met the employer's legitimate performance expectations, there is a factual controversy between the positions of the parties as to whether plaintiff's performance was meeting performance expectations. However, because we shall resolve all factual disputes in favor of plaintiff, and because we find that the resolution of this issue is not dispositive as to whether plaintiff can make out a *prima facie* case of age discrimination, we shall assume *arguendo* that plaintiff meets the second prong of the *McDonnell Douglas* test, i.e., that he met Pueblo and CaribAd's legitimate performance expectations. Finally, although this is also a fact contested by defendants, we shall assume *arguendo* that plaintiff complies with the fourth prong of the test, that the employer did not treat age neutrally or retained younger persons when they hired Aníbal García to assume some, if not most, of plaintiff's former responsibilities as President of CaribAd.

It is when we address the third prong of the test, that the employee must have experienced an adverse employment action, that plaintiff's case falters. Plaintiff's last day at CaribAd was on June 14, 1996, when he initially took an extended sick leave and then took vacation time. It is an undisputed fact that since plaintiff resigned his position as President of CaribAd, in order to make out a *prima facie* case of age discrimination under ADEA, he must present sufficient evidence that he was constructively discharged by defendants. If he fails to present evidence that he was constructively discharged, he will not comply with even the relatively light burden of presenting a *prima facie* case of age discrimination.

■ The First Circuit has held that in determining whether an employee has been constructively discharged, courts must utilize an "objective standard" in scrutinizing an employer's actions. *Serrano–Cruz*, 109 F.3d at 26, *citing Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986). In order to hold Pueblo liable for having constructively discharged plaintiff, "the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). As the First Circuit recently held, "[a]n employee may not, therefore, be unreasonably sensitive to a change in job responsibilities." *Serrano–Cruz*, 109 F.3d at 26.

This Court has found that "[a] decrease in salary and benefits is one factor considered in constructive discharge cases, but the fact that salary and benefits have not been decreased is not dispositive." *Ortiz Rodriguez v. Banco Popular de Puerto Rico*, 27 F.Supp.2d 309, 314 (D.P.R.1998). In that case, the Court also found that other factors to be considered by the Court in determining whether a plaintiff was constructively discharged is whether an employee was demoted from a supervisory position and whether the new employment conditions "would be humiliating or demeaning." *Id.* at 314–15.

■ Contrary to the case in *Ortiz Rodriguez*, plaintiff in this case cannot point to tangible adverse effects upon his employment conditions. In *Ortiz Rodriguez*, the district court denied summary judgment, finding that plaintiff had presented sufficient evidence of constructive discharge because she was transferred to a new position where she lost supervisory responsi-

bility, she was transferred to a smaller branch of the bank, and she lost an earned raise in salary. In contrast, plaintiff's evidence pointing to constructive discharge by defendants consists of an increase in responsibility which cannot be viewed as onerous in light of plaintiff's leadership position and his high remuneration. The only other evidence pointing to a constructive discharge is the proposed closing of the Hato Rey office and the opening of two separate CaribAd offices. While plaintiff claims that the Hato Rey office was merely a sham to isolate him from the day-to-day operations of the agency, he has not presented a single shred of evidence to dispute defendants' assertion that plaintiff was supposed to have an office at both locations, in order to attract third party business while in Hato Rey, and to be able to supervise his staff at the Carolina office. Since plaintiff resigned before the relocation plan even began to be implemented, there is absolutely no bona fide evidence beyond plaintiff's bare assertions that the relocation plan was a sham to isolate and harass him instead of a response to changing business conditions.

Plaintiff relies heavily upon the First Circuit's upholding of a jury finding of constructive discharge in violation of Puerto Rico's employment discrimination law in *Ramos v. Davis & Geck,* 167 F.3d 727 (1st Cir.1999). We find, however, that the facts of that case are clearly distinguishable from the one at bar. In *Davis & Geck,* plaintiff was replaced as budget supervisor by a younger employee, who he himself had trained. When plaintiff was not able to finish a required report because the computer system had broken down at the company, his supervisor told him to go home because plaintiff was "a tired old man." *Id.* at 730. In addition, upon his return from a mandatory leave, his office assignment had been changed, his replacement was in his former cubicle; he was given a cubicle termed "the death cubicle" because its prior assignees had all left the company and was given an obsolete, non-working computer. *Id.* When plaintiff could not comply with requests from his supervisor to finish certain reports because he had no computer, his supervisor stood behind him and threatened to assault him. As a cumulative result of this harassment, plaintiff went to the company infirmary, was excused from work, and never returned. The Court found that under this cumulation of facts, a reasonable jury could have found that Ramos was constructively discharged.

Instead, we find that the facts of the case at bar are much more similar to those in *Serrano–Cruz, supra.* In that case, the First Circuit upheld the district court's granting of summary judgment because it had determined that plaintiff had failed to establish a *prima facie* of age discrimination. The Court found that plaintiff could not establish that her transfer constituted a "constructive discharge" and thus no adverse employment action was taken against her. Serrano–Cruz was transferred from her position as company comptroller to a position as "retail manager." It was undisputed that her salary and benefits would remain the same in the new position, a fact noted by the First Circuit but deemed not dispositive. To that end, the Court stated that "[c]ommon sense suggests that a job transfer without a reduction in benefits may, under certain circumstances, be unacceptable to a reasonable person who is overqualified and humiliated by an extreme demotion, or underqualified and essentially 'set up to fail' in a new position." 109 F.3d at 26.

The Court determined that it was significant that plaintiff never tried out her new position, claiming that her change in position constituted a "devastating change in status", *Id.* at 27, but could not point to any tangible problems that would arise from the assumption of the position. It found that plaintiff's claim of constructive discharge "rests on speculations regarding the new position, as well as on her sworn statements to the effect that supervising retail sales would harm her dignity. Loss

of prestige in a job transfer, standing alone, cannot support a finding of constructive discharge." *Id.* The Court further stated, that "[t]he decisive consideration here is that, by not accepting the newly created and ambiguous position, [plaintiff] foreclosed the possibility of presenting concrete evidence, rather than mere assertions, to a jury regarding the nature of her new working conditions." *Id.*

We find that such is the case here. Plaintiff bases his claim of constructive discharge mostly on the fact that he was to be relocated to a new office in Hato Rey as part of a sham to harass him, isolate him, and remove him from his leadership position, all because of his age. However, he cannot dispute the fact that defendants assert, and have a contemporaneous memorandum to plaintiff to back it up, that plaintiff was meant to have offices at both locations so that he could drum up third party business in the Hato Rey office and supervise his staff at the Carolina office. Furthermore, plaintiff's last day at work was the day that Keon announced the relocation and reorganization plan. All we have is plaintiff's unsupported allegations that the relocation plan would not work and that it was meant to isolate and harass him because defendants never had the opportunity to implement the relocation plan while plaintiff was with the company. Plaintiff resigned before the relocation plan was to take effect; thus, there is no evidence of plaintiff's conjectures that defendants meant to isolate him and remove him from a position of authority, because he, like Serrano–Cruz, "cannot possibly muster proof that, in the course of a trial, could lead a jury to find that the newly created position would compel a reasonable person with her background to refuse the offer and resign." *Id.* at 26.

In short, plaintiff cannot point to any objective evidence that defendants imposed such onerous working conditions that a reasonable person would have had to resign. First, because plaintiff resigned before the relocation plan could be implemented, there is no evidence that the same was instituted in an effort to isolate and harass plaintiff. Second, requesting a three-page relocation plan on short notice could not be interpreted as setting plaintiff up to fail, when plaintiff was a highly compensated employee in a position of trust and producing a short document on short notice can not be deemed so onerous as to make a reasonable person feel that he had to resign. Finally, the changes implemented in the way that the operating meetings were run could not be deemed an act of age discrimination against plaintiff when the change applied to all employees alike, both young and old, and plaintiff can only assert, without evidence, that this change was meant to isolate him from the decision-making process at CaribAd.

We find that even under the relatively light burden imposed on plaintiffs to make a *prima facie* case of age discrimination under the *McDonnell Douglas* framework, plaintiff has clearly failed to present sufficient evidence that his resignation in June of 1996 was a constructive discharge as required by the third prong of the test. In light of that, plaintiff cannot maintain an action for age discrimination under ADEA and his ADEA claims must be dismissed.

**Supplemental Jurisdiction Claims**

 It is hornbook law that district courts have discretion to exercise supplemental jurisdiction over the state law claims where the state and federal claims derive from a *common nucleus of operative facts.* *See,* 28 U.S.C. § 1367; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Nevertheless, where, as here, the existing federal claims warrants dismissal prior to trial, the district court should decline to exercise supplemental jurisdiction.

Some courts have stated that the holding in *Gibbs* "seems clearly to require dismissal without action on the merits and without any exercise of discretion if all the federal claims ... are found to be short of trial, deficient." *See, e.g., Snowden v. Mil-*

58

*linocket Regional Hosp.* 727 F.Supp. 701, 709 (D.Me.1990). Such a result is warranted in view that "[t]he power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit". *Newman v. Burgin,* 930 F.2d 955, 963 (1st Cir.1991). *See also Vera–Lozano v. International Broadcasting,* 50 F.3d 67 (1st Cir.1995).

Although district courts are not obligated to dismiss pendent state law claims, in the usual case in which the federal-law claim is dismissed before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state law claims. In such a case, state-law claims should be dismissed. *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350 n. 5, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); citing *Gibbs* 383 U.S. at 726–727, 86 S.Ct. 1130; *see Mercado–Garcia v. Ponce Federal Bank,* 979 F.2d 890, 896 (1st Cir. 1992); *Rivera v. Murphy,* 979 F.2d 259, 264 (1st Cir.1992); *Figueroa Ruiz v. Alegria,* 896 F.2d 645 (1st Cir.1990). In light of the above, plaintiff's supplemental law claims pursuant to Puerto Rico law will be dismissed without prejudice.

## Conclusion

In view of the above discussion, plaintiffs' claims under ADEA are **DISMISSED WITH PREJUDICE.** Plaintiffs' remaining supplemental law claims under Puerto Rico's Law 100 and Articles 1802 and 1803 of the Puerto Rico Civil Code are **DISMISSED WITHOUT PREJUDICE.** Accordingly, defendants' motion for summary judgment **(Docket # 107)** is **GRANTED** and the above-captioned action shall be **DISMISSED.** Judgment shall be entered accordingly.

**SO ORDERED.**