**Francis BERMUDEZ–VAZQUEZ, et al., Plaintiffs**

v.

**CENTENNIAL DE PUERTO RICO, Defendant**

No. CIV. 02–2207(JP).

United States District Court, D. Puerto Rico.

Aug. 4, 2003.

Erick Morales–Pérez, Carolina, PR, for Plaintiff.

Luis A. Núñez–Salgado, José F. Benítez–Mier, O'Neill & Borges, San Juan, PR, for Defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

The Court has before it Defendant Centennial de Puerto Rico's Motions for Summary Judgment as to the claims of Co–Plaintiffs Francis Bermúdez Vázquez (docket No. 25), Pedro Ortiz Cruz (docket No. 26), Rafael Morales Christian (docket No. 27), and David Massó Sabater (docket No. 28) and Plaintiffs' opposition thereto (docket No. 31). Each Plaintiff alleges that he was discriminated against based on his race, either through failure to promote, constructive discharge, or termination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1), 42 U.S.C. §§ 1981 and 1983, and in violation of Puerto Rico law.

Defendant now moves for summary judgment, with separate motions for each of the Plaintiffs' claims. Defendant alleges that Co–Plaintiff Bermúdez, who claims that Defendant failed to promote him based on his race, failed to plead a prima facie case for discrimination because he did not present evidence as to the qualifications of the people who were selected to fill the position in question. Defendant states that it failed to promote him due to an ongoing conflict he created with his supervisor that created strife and division among his sales team.

Defendant moves for summary judgment as to the claims of Co–Plaintiff Massó, alleging that he has failed to show he was constructively discharged because, according to Defendant, no evidence exists to support his claim that Defendant made his work intolerable, thus forcing him to leave. In addition, Defendant claims that Co–Plaintiff Massó never used the internal

grievance procedure to report the alleged discrimination, giving Defendant an affirmative defense to Co–Plaintiff's claims.

As for the claims of Co–Plaintiffs Ortiz and Morales, Defendant moves for summary judgment claiming that Co–Plaintiffs have failed to plead a prima facie case because they have not shown that their job performance was satisfactory. Defendant states that it fired Co–Plaintiffs because they were not meeting the sales quota requirements for their positions.

## II. UNCONTESTED FACTS

These are the uncontested facts that the parties stipulated to as per order of the Court (docket No. 11).

1. Centennial is a corporation dedicated to providing broad-line and wireless communications services in Puerto Rico.

2. Centennial employs Internal Sales Representatives ("ISRs") to sell Centennial's products at its stores, kiosks, and booths.

3. Centennial has an "Associates Manual" that contains most of Centennial's policies, norms and procedures applicable to its employees, including ISRs.

4. A copy of the Associates Manual was given to each of the Plaintiffs when they commenced their employment with Centennial.

5. The Associates Manual includes Centennial's Equal Employment Opportunity Policy and its Anti–Discrimination and Harassment Policy. Both policies strictly prohibit any type of illegal discrimination in the workplace.

6. Centennial's Anti–Discrimination and Harassment Policy provides its employees with an internal grievance procedure to report and resolve any complaints of alleged illegal discrimi-nation or any other employee grievance.

7. Centennial also has a Sales Representative Compensation Plan, which contains the sales policies and procedures applicable to the ISRs.

8. Centennial's Sales Representative Compensation Plan was given to all Plaintiffs when they began working with the company. According to the Sales Representative Compensation Plan, the ISRs have a starting fixed annual base salary of approximately $10,000.00 and a variable salary based on commissions for sales generated.

9. The Team Leader is an ISR who assists the Kiosk Manager with his or her duties. The Team Leader earns an annual base salary of approximately $15,000.00 and a variable salary based on commissions from sales.

10. Centennial's sales policy requires that all ISRs obtain sales of at least 80% of the sales quota set by the Company for each sales cycle.

11. In order to comply with the sales policy, the ISR has to achieve a minimum of at least 80% of the quota for each sales cycle.

12. Centennial's sales policy establishes disciplinary measures for ISRs who do not meet the expected quota for each sales cycle.

13. Under Centennial's sales policy, the same provides that if an ISR has a deficient sales cycle (less than 80% of required sales quota), the ISR's supervisor notifies him or her about his or her failure to reach the expected quota for the sales cycle.

14. According to Centennial's sales policy, an ISR who fails to achieve at least 80% of the assigned quota in any three sales cycles within any six month period may be terminated.

15. Co–Plaintiffs Pedro Ortiz Cruz and Rafael Morales Christian were former ISRs of Defendant.

16. The reason expressed by Centennial to terminate Ortiz and Morales was their failure to comply with the sales policy.

17. Co–Plaintiff David Massó Sabater was hired by Centennial as an ISR.

18. Massó was promoted to a Team Leader position in October of 2000.

19. Massó resigned his employment with Centennial on March 19, 2001.

20. Massó commenced his employment with Sanofi Synthelab, a pharmaceutical company, in March 2001, after resigning from Centennial.

21. Francis Bermúdez Vázquez currently works at Centennial as a Team Leader in the Humacao area.

22. Ortiz, Massó, Morales and Bermúdez did not present any of their complaints to Centennial through Centennial's internal grievance procedure.

23. Ortiz began working for Centennial on April 10, 2000, as an ISR in the Humacao area.

24. The only position Ortiz held with Centennial was as an ISR.

25. Wilfredo Lugo, Kiosk Manager, and Luis Colón interviewed Ortiz during the application processes.

26. Ortiz worked with Centennial without interruption from April 10, 2000 until October 12, 2001.

27. Bermúdez was Ortiz's Team Leader throughout his entire tenure with Centennial.

28. Ortiz received a pay raise on June 14, 2001.

29. Ortiz was aware of Centennial's sales policy since he began working with Centennial.

30. During his entire tenure with Centennial, Ortiz was aware that disciplinary measures could be imposed on those ISRs who did not comply with Centennial's sales quota for each sales cycle.

31. On September 8, 2001, Sandra Padilla gave Ortiz a memo notifying a deficient sales performance for the month of July of 2001. In July 2001, Ortiz obtained 37% of the sales quota.

32. In October of 2001, Ortiz received a memorandum notifying a deficient sales performance for the month of September 2001. In September 2001, Ortiz obtained 34% of the sales quota.

33. Ortiz was interviewed for a position in the Quality Assurance Department.

34. Ortiz was not hired for the Quality Assurance position he applied for.

35. Aside from applying for a position in Quality Assurance Department, Ortiz did not apply for any other positions.

36. Ortiz had at least three deficient sales cycles in the six-month period that immediately preceded his termination (June 2001—55%; July 2001—37%; September 2001—34%).

37. In October of 2001, Sandra Padilla gave Ortiz a memo notifying him of his third deficient sales cycle within a six-month period.

38. Padilla terminated Ortiz on October 12, 2001.

39. Ortiz has not suffered any sicknesses or hospitalizations resulting from his termination.

40. Massó commenced his employment with Centennial on June 2, 1998, as an ISR.

41. Massó worked with Centennial without interruption until March 19, 2001.

42. Massó was given a copy of Centennial's Associates' Manual when he began working for the company.

43. Among their duties, ISRs are responsible for safekeeping the payments made by clients and the products sold at the kiosks. In order to avoid losing the money received from clients, ISRs must follow and comply with Centennial's cash management procedures.

44. According to Centennial's cash management policy, employees could be disciplined for any breach of the policy, which could include suspension or termination. All employees, including Massó, were aware of this policy.

45. In November 1999, a deposit was lost at one of the kiosks. The missing deposit was in the amount of $1,743.59. On that date, Massó was in charge of closing the kiosk, counting the money received and preparing the deposit slips.

46. Centennial investigated the loss of the deposit.

47. As a result of the investigation, Massó was suspended from his employment for five days. Massó did not challenge his suspension.

48. On or about the time of his suspension, Massó started applying for Team Leader positions.

49. On October 26, 2000, around nine months after his suspension, Massó was promoted to Team Leader in the Guaynabo area.

50. As a result of his promotion, Massó's annual based salary was increased from $10,000.00 to $15,000.00.

51. Massó resigned on March 19, 2001.

52. Massó did not state racial discrimination as the motivation for his departure.

53. In his March 19, 2001 resignation letter, Massó expressed gratitude for the valuable experience he gained, stating "Centennial has the best people in this competitive environment."

54. Morales started working with Centennial on August 16, 2000, as an ISR in Humacao. He worked with Centennial without interruption until February 13, 2001.

55. Morales was aware of Centennial's Sales Representative Compensation Plan while he worked for Centennial.

56. Bermúdez was Morales' Team Leader from the time he began working at Centennial until his termination.

57. Morales did not apply to any other positions while an employee of Centennial.

58. Morales demonstrated the following deficient sales cycles during his last six months of employment: August 2000(66%); October 2000(61%); November 2000(44%); January 2001(49%).

59. On February 13, 2001, Morales had not achieved the sales quota for at least three sales cycles and was terminated.

60. Morales received memorandums for his deficient sales performance.

61. On February 13, 2001, Padilla terminated Morales.

62. Bermúdez began to work for Centennial on June 28, 1998. Since then, he has worked for Centennial without interruptions.

63. On May 1, 1999, Bermúdez was promoted to a Team Leader position.

64. In October, 1999, Bermúdez applied for a Kiosk Manager position in Humacao. Wilfredo Lugo was selected for the position.

65. Lugo was Bermúdez's supervisor from April 1999, until February 2001.

66. Wilfredo Lugo and Francis Bermúdez had administrative and managerial differences.

67. After filing his Anti–Discrimination Unit charge, Bermúdez has not applied for any other managerial positions. After filing his Anti–Discrimination Unit charge, Bermúdez's supervisors have urged him to do so.

## III. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 894 (1st Cir.1988). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *Id.* at 248, 106 S.Ct. 2505; *Mack v. Great Atl. & Pac. Tea Co., Inc.*, 871 F.2d 179, 181 (1st Cir.1989). A material issue is "genuine" if there is sufficient evidence to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to show that "sufficient evidence supporting the claimed factual dispute [exists] to require a jury or judge to resolve the parties' differing versions of truth at trial." *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968). The party opposing summary judgment may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through filing of supporting affidavits or otherwise, that there is a genuine issue for trial. *See id.; see also Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). On issues where the non-movant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion. *See Anderson*, 477 U.S. at 256–57, 106 S.Ct. at 2514–15.

## IV. CONCLUSIONS OF LAW

### A. *Claims Alleging Racial Discrimination Under Title VII and Section 1981*

Plaintiffs bring the instant action for race discrimination under Title VII and 42 U.S.C. § 1981. Title VII of the Civil Rights Act of 1964, provides, in relevant part, that:

> It shall be an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race. 42 U.S.C. § 2003–2(a).

Plaintiffs also bring a claim for race discrimination under 42 U.S.C. § 1981. In order to prevail under Section 1981, a plaintiff must prove purposeful employment discrimination: the ultimate issue is whether the defendant intentionally discriminated against the plaintiff, under the by-now familiar analytical framework used in disparate treatment cases under Title VII. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989). Thus, the Court will apply the same analysis to both claims at this stage of the proceedings. *See Lewis v. University of Pittsburgh,* 725 F.2d 910, 915, n. 5 (3d Cir.1983) (holding that claims brought under Section 1981 require same elements of proof as Title VII action). For claims brought under Title VII and cases brought under 42 U.S.C § 1981, an employee can prove discrimination through direct evidence or through indirect evidence using the burden shifting framework established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). In this case, the Plaintiffs have not presented direct evidence of discrimination. Because the evidence supporting Plaintiffs' claims is circumstantial, the Plaintiff carries the burden of establishing a prima facie case of discrimination. *See id.* In order to establish a prima facie case under Title VII, the Plaintiff must show (1) he or she is a member of a protected class; (2) his or her employer took an adverse employment action against him or her; (3) he or she was qualified for the employment he or she held and (4) his or her position remained open or was filled by a person whose qualifications were similar to his or hers. *See Rodríguez–Cuervos v. Wal–Mart Stores,* 181 F.3d 15, 19 (1st Cir.1999).

Once the Plaintiff has satisfied the requirements for a prima facie case, the Court presumes that intentional discrimination has occurred. *See id.* However, the Defendant may rebut this presumption by articulating a legitimate, non-discriminatory reason for the adverse employment action at issue, which then removes the initial presumption of discrimination. *See id.* The Plaintiff must then show that the Defendant's allegedly legitimate and non-discriminatory motivation was actually a pretext for discrimination. *See id.*

While all of the Plaintiffs bring their claims under Title VII and Section 1981, the circumstances of their claim are sufficiently distinct to warrant individual analysis. Accordingly, the Court will analyze each Plaintiff's claims in turn.

### 1. *Bermúdez's Claim for Discriminatory Failure to Promote*

Plaintiff, who identifies himself as a black Puerto Rican, continues to work for Defendant as a kiosk "team leader". He testifies that his job performance was satisfactory and that he received excellent reviews from his employer. According to Plaintiff, Defendant announced openings for a series of management positions. Plaintiff applied for these positions yet was not selected for the positions. Plaintiff testifies that the positions were filled with white personnel who were not more experienced or better qualified than Plaintiff.

This claim is considered a claim for disparate treatment discrimination in hiring and promotion under Title VII. In order to establish a prima facie case of discrimination in hiring or promotion, Plaintiff must show that (1) he is a member of a protected class; (2) he applied for and was qualified for a job or promotion for which the employer was seeking applicants; (3) despite Plaintiff's qualifications, he was rejected for the job and (4) after Plaintiff's rejection, the position remained open, and the employer continued to seek applica-

tions from persons having the same qualifications as the Plaintiff. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

According to Defendant, Plaintiff Bermúdez has failed to plead a prima facie case because he has not presented information as to the qualifications of the pool of applicants who applied for the positions at issue or the criteria used to select personnel for the position. In fact, according to Defendant, applicants Héctor González and Jeffrey Santiago were more qualified than he was. Defendant alleges that Plaintiff has failed to satisfy the fourth prong of the McDonnell–Douglas analysis because he has not provided information as to the other applicant's qualifications. *See Rodríguez–Cuervos v. Wal–Mart Stores, Inc.,* 181 F.3d 15, 20, n. 2 (1st Cir.1999) (Plaintiff did not comply with fourth prong of the McDonnell–Douglas formula where Plaintiff did not present any evidence that person who filled the position had qualifications similar to his).

■ The Court disagrees and finds that Plaintiff has successfully plead a prima facie case for racially discriminatory failure to promote. The position Plaintiff applied for was titled "Kiosk Sales Manager". Plaintiff offers as evidence the deposition of Jesús Benítez Soto, the former regional manager who interviewed Plaintiff for the position. According to Benítez, the people selected for the open positions were Sandra Padilla and Jeffrey Santiago. Benítez states that Padilla has a bachelor's degree in political science and that Santiago had a bachelor's degree in marketing. Both were previously "team leaders" before taking the position. The deposition also provides detailed information as to the selection process. Plaintiff Bermúdez has a bachelor's degree in management and works as a team leader; thus he possesses the same general qualifications as Padilla and Santiago. Plaintiff has provided to the Court a document listing the education of Centennial Sales Managers as of May 28, 2003, which shows that the majority of managers currently working for Defendant have obtained bachelor's degrees, with the concentration representing a broad range of subjects; however, most of the degrees are in Finance, Accounting, Management, Business Administration, and Marketing. Plaintiff also applied to four other management positions which were filled by Wilfredo Lugo, whose education level is not known, Edwin Colón, who has a B.A., concentration unknown, Luis Colón, who has a B.A. in marketing, and Hector González, who was, as of May 28, 2003, in his fourth year of biology. According to Plaintiff's testimony, all of those chosen to occupy the position were white. The Court finds that the qualifications of Plaintiff and the personnel who were selected for the positions are sufficiently similar to satisfy Plaintiff's burden under prong four of the McDonnell–Douglas test.

As Plaintiff has plead a prima-facie case, Defendant must now articulate a legitimate, non-discriminatory reason for not selecting Plaintiff. *See McDonnell,* 411 U.S. at 802, 93 S.Ct. at 1824. There are three separate incidents where Plaintiff applied for a promotion and was not granted the promotion. First, in October 1999, for a Kiosk Manager position in Humacao, second, in February 2001, for the same Kiosk Manager position in Humacao, and third, in April 2001, for a Kiosk Manager position in Caguas. Defendant explains that Plaintiff did not initially qualify for the position filled by Lugo in October 1999, because of the brief period that had elapsed between his entry into the "Team Leader" position and the opening date for the "Kiosk

Manager" position. Second, regarding the position that opened in February 2001, Defendant states that Co–Plaintiff Bermúdez, during his tenure as a "Team Leader", failed to demonstrate the necessary leadership and managerial capacity necessary to occupy a managerial position, according to the testimony it presents from its employees. In addition, Defendant claims that "promoting Bermúdez would have created employee discontent within the region." Defendant explains that, shortly after Defendant's failure to promote him to the position filled by Lugo, the working relationship between Bermúdez and Lugo suffered. Defendant states that Plaintiff did not approve of Lugo's management style and openly questioned it, which created division in the Humacao office and lowered office morale. According to Defendant, the conflict ended when Defendant terminated Lugo; Plaintiff then applied for the position left open after his departure. Defendants, Regional Sales Manager Jesús Benítez, Sales Director of Centennial's Kiosk, Angel Moraza, and General Sales Manager Edwin Stevenson, who chose the candidate to fill the position, felt that Plaintiff did not "manage this situation positively and proactively" which lead them to believe that he was not the best candidate for promotion. Defendant believed that it needed someone who could unite the now divided sales team. Finally, Defendant asserts that Plaintiff, in his quest to obtain a management position, lost focus and "left his team in a state of angst." As for the manager position that opened in Caguas in April 2001, Defendant states that it merely chose the runner-up from the selection process for the Humacao region so as not to undergo another interview process, according to testimony by Defendant employee Edwin Stevenson, who participated in the selection process.

According to the Supreme Court, in order to substantiate a legitimate, non-discriminatory reason for its conduct, the Defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Plaintiff has, understandably, contested Defendant's explanation; however, the burden of articulating a legitimate, non-discriminatory reason is a burden of production, not persuasion, and thus cannot involve determinations of credibility.

As for the first failure to promote in 1999, Defendant has explained that Plaintiff did not qualify for the position because of the brief period of time that had passed between his promotion to the position he held at the time and the opening of the new position. The Court finds that, if it believes this explanation as true, it is a legitimate and non-discriminatory explanation for Defendant's failure to promote Plaintiff.

As for the second failure to promote in February 2001, Defendant has provided testimony from various management employees describing Plaintiff's lack of qualifications for a management position due to his demonstrated lack of leadership ability after the dispute with his supervisor and their desire to reunite the sales team. Following the mandate of the Supreme Court, the Court concludes that these explanations, if true, would constitute legitimate, non-discriminatory reasons for not promoting Plaintiff to a management position. It is proper, legal, and within the discretion of management to decide not to promote an employee who has divided his

coworkers and shown a lack of leadership ability.

As for the manager position that opened in Caguas in April 2001, Defendant states that it chose the runner-up from the selection process for the Humacao region so as not to undergo another interview process. If the Court believes this explanation, it finds that it is a legitimate, non-discriminatory explanation.

■ Therefore, the presumption of discrimination now "drops out", leaving the burden on Plaintiff to persuade the factfinder that Defendant's proffered reasons were actually pretextual.

As the Defendant has offered legitimate, non-discriminatory reasons for not promoting Plaintiff to the October 1999 Humacao position, the February 2001 position, and the April 2001 Caguas position that opened soon thereafter, the Court must now give Plaintiff an opportunity to prove, by a preponderance of the evidence, that the legitimate reasons offered by the Defendant were not its true reasons, but were actually a pretext for discrimination. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

■ Plaintiff testifies in his deposition that his relationship with his supervisor, Lugo, was not good, that he made the wrong decisions, that he was not fair, that the sales team was divided between those who approved of Lugo and those who did not, and that a meeting or meetings were held regarding the issue. However, Plaintiff testifies that the situation arose because Lugo was not properly performing his duties as a manager, not by any fault of Plaintiff. Plaintiff lists a variety of failings in his depositions, including Lugo's failure to take inventory, failure to address personnel situations, and failure to ensure that the sales team was meeting its quota

requirement. While Plaintiff's version of the dispute may call into doubt his culpability for the strife in his division, it, in itself does not constitute evidence of pretext. Rather, it is a common incident of "office politics" that lies beyond questions of race and thus not covered by the federal statutes in question. Title VII was not designed to transform Courts into "super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *See Feliciano*, 218 F.3d at 8 at *citing Mesnick v. General Elec. Co.*, 950 F.2d 816, 825 (1st Cir.1991).

However, Plaintiff has presented what he believes to be evidence of racial animus in his workplace. According to Plaintiff, he was present at meetings where Sales Manager Arnaldo Hernández would make jokes of bad taste regarding black people. In his deposition, Plaintiff states that, during a meeting for all the team leaders, Hernández stated that they had a "black month, and he stared at me, and everyone started to laugh. And later he told me not to feel bad, you know, he apologized because of the joking around." As far as the record shows, Hernández was not involved in the selection processes for the promotions at issue. Thus, the Court finds that this single statement does not show, by a preponderance of the evidence that Defendant's explanations for its failure to promote him were a pretext for discrimination because the statement and the person who made the statement are so far removed from the actual selection process.

Plaintiff states that General Sales Manager Edwin Stevenson, who was involved in the selection of candidates for the promotions at issue, had a practice of calling people below him in the hierarchy "negritos." Plaintiff testifies that "perhaps in this country people take that as something normal, but to me I've always believed it to

be a lack of respect." While the Defendant states that the term "negrito" can be used in Puerto Rico as a term of endearment, Plaintiff states that "I know what's behind all of this term of 'endearment' of negrito' ... it is not normal ... it is a totally discriminatory word that has always been used to denigrate people who belong to the black race." In Plaintiff's understanding, Edwin Stevenson used the term to discriminate against black people. However, the Court notes that Co–Plaintiff David Massó Sabater, in his deposition, states that other people called Stevenson "negrito."

■ The Court finds that Plaintiff has not presented sufficient evidence to counter Defendant's proffered legitimate, non-discriminatory reasons for failing to promote him. To obtain relief under Title VII, the evidence must permit a factfinder to reasonably infer that unlawful discrimination was a determinative factor in the employer's decision. *See Feliciano*, 218 F.3d at 8. Defendant has presented detailed and compelling reasons for not promoting Plaintiff for each of the incidents that he cites as constituting discrimination in promotion. While Plaintiff has presented two incidents that indicate the possible presence of racial animus on the part of Defendant's employees, the Court finds that this evidence does not rise to the level necessary to satisfy Plaintiff's burden of persuasion at this final stage of the McDonnell–Douglas analysis. The evidence of racial animus Plaintiff presents consists of isolated statements not connected to the selection process that fail to bring into doubt the legitimacy of Defendant's proffered non-discriminatory explanations. Thus, the Court cannot find, according to the standard established by precedent, that unlawful discrimination was a *determinative factor* in Defendant's decisions not to promote Plaintiff. His

inability to present a showing of racial discrimination also proves fatal to his claims brought under 42 U.S.C. § 1981. Therefore, the Court **GRANTS** Defendant's motion for summary judgment as to the claims of Co–Plaintiff Francis Bermúdez–Vázquez.

■ While it is not necessary for purposes of the resolution of this motion to further address Defendant's arguments for summary judgment, the Court will address one of Defendant's arguments because it finds that it is important to clarify a particular point of law. Defendant states that Plaintiff failed to use the internal grievance policy provided in Centennial's anti-discrimination manual and anti-harassment policy; thus, Defendant claims to have an affirmative defense to Plaintiff's claim under the *Faragher–Ellerth* defense. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S.Ct. 2275, 2275, 141 L.Ed.2d 662 (1998), *Burlington Industries v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 2257, 141 L.Ed.2d 633 (1998). However, the *Faragher–Ellerth* defense is not a bar to liability where the Plaintiff has suffered a "tangible employment action." A "tangible employment action" includes hiring, firing, a failure to promote, a reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *See Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 20 (1st Cir.2002), *citing Faragher*, 524 U.S. at 781, 118 S.Ct. 2275; *see also Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257. In this case, Defendant failed to promote Plaintiff on three occasions, which constitute tangible employment actions. Therefore, the affirmative defense does not apply.

### 2. *Massó's Claim for Constructive Discharge*

Co–Plaintiff David Massó–Sabater worked for Defendant as a kiosk salesman

in the Carolina area beginning in June 1998 until his resignation on March 19, 2001. Co–Plaintiff states that he was one of the best salesman at Centennial and that he received excellent evaluations. On various occasions, Co–Plaintiff applied for promotions to "team leader" positions. According to Plaintiff, who identifies himself as black, he was not selected for the positions and they were filled with white applicants who were not more qualified or experienced than he was. Plaintiff was eventually granted a promotion; however, Plaintiff testifies that Defendant placed undue pressure on him to perform based on his race and imposed conditions on him that were not imposed on white workers. Based on the pressures of this environment, Plaintiff claims that he was forced to resign.

According to Defendant, Plaintiff has failed to show that he suffered an adverse employment action as required to plead a prima facie case for race discrimination under Title VII and Section 1981. Five months prior to his resignation, Plaintiff was promoted to a team leader position. During the time period between his promotion and his resignation, Defendants state that he was not disciplined, demoted, or transferred, he was not subjected to different working conditions or expectations, nor were his salary or benefits decreased. Finally, in his resignation letter, Plaintiff thanked Defendant for "three rewarding years" with the company, where he had "grown in experience, professionalism, and skill."

▇▇▇▇▇ In order to establish a prima facie case under Title VII, the Plaintiff must show (1) he or she is a member of a protected class, (2) his or her employer took an adverse employment action against him or her; (3) he or she was qualified for the employment he or she held and (4) his or her position remained open or was filled

by a person whose qualifications were similar to his or hers. *See Rodríguez–Cuervos,* 181 F.3d at 19. Here, no tangible adverse employment action, like termination, demotion, or a failure to promote, was taken against Plaintiff; in fact, he received the promotion he was seeking. Thus, Plaintiff instead has plead that he was "constructively discharged." He claims that, even though he was promoted, he was subjected to racially discriminatory work conditions that forced his resignation. In order to prevail on his constructive discharge claim, Plaintiff must show that his working conditions became so intolerable that a reasonable individual in his shoes would have felt compelled to resign. *See Serrano–Cruz v. DFI Puerto Rico,* 109 F.3d 23 (1st Cir.1997). The phrase "constructive discharge" describes "harassment so severe and oppressive that staying on the job while seeking redress ... is intolerable." *See Reed v. MBNA Marketing Systems,* 333 F.3d 27 (1st Cir.2003). When this standard is applied, "it does not guarantee a workplace free from the usual ebb and flow of power relationships and inter-office politics." *Suárez v. Pueblo International, Inc.,* 229 F.3d 49, 54 (1st Cir. 2000). Thus, the bar for pleading constructive discharge is quite high. In order to substantiate his claim, Plaintiff has provided the following evidence. First, he testifies that Sales Manager Carmen Rivera and Jesús Benítez Soto, who recommended Plaintiff for promotion, stated that they had to "sign with blood their jobs to my performance", and that General Sales Manager Edwin Stevenson told him that Rivera and Benítez's jobs were on the line if he did not perform. Second, Plaintiff testifies that Sales Manager Jesús Benítez had told him that his supervisors (unnamed) considered him to be "a clown." Plaintiff does not describe any other incidents on the job at his new position that would have made his time there so intoler-

able that he would have felt compelled to resign. Apparently, Plaintiff feels that he was under too much pressure to perform because he had been told that the jobs of the people who had recommended his promotion were "on the line." The Court does not consider this type of pressure to be intolerable. Plaintiff cites this one statement, yet does not refer to any actual experiences or specific incidents on the job where supervisors or other personnel placed pressure on him to perform and treated him differently than white workers. Plaintiff's assertions are vague and unsubstantiated. Plaintiff has not plead sufficient evidence to show that any pressure he felt was based on his race to survive this motion for summary judgment.[1] Plaintiff must show he suffered an adverse employment action to sustain a prima facie case; because he has not done so, the Court does not find it necessary to address any other aspects of his claim. His inability to present a minimum showing of racial discrimination also proves fatal to his claims brought under 42 U.S.C. § 1981. Therefore, the Court **GRANTS** Defendant's motion for summary judgment as to Plaintiff David Massó–Sabater's claims.

### 3. Morales' and Ortiz's Claim for Discriminatory Termination

Plaintiffs Rafael Morales–Christian and Pedro Ortiz, who both identify themselves as black, worked as kiosk salesmen for Defendant in the Humacao area. Both Plaintiffs admit that they did not fulfill their monthly sales quotas on three occasions within a six month period. According to Defendant's regulations, if an employee fails to fulfill 80% of his or her monthly sales quota three times within a six month period, Defendant is permitted to terminate the employee. Plaintiffs state that a total of three black employees, Co–Plaintiff Rafael Morales, Co–Plaintiff Pedro Ortiz and Claudio de León, were terminated while two white employees, José Santiago and Javier Morales, were transferred to other positions. The parties agree that Javier Morales[2], was transferred to "Quality Control." Plaintiff Ortiz states he applied to this position after Sales Manager Sandra Padilla recommended that he do so but that he was not granted the position. Plaintiff Ortiz states that he believed that José Santiago, who is white and who he claims was transferred, had received "three memos", indicating sales performance under the required quota for three months. Plaintiff admits that Juan González, a white person, was terminated on the same day as Plaintiff Ortiz for failing to meet his sales quotas. However, according to Plaintiffs, it is "obvious to any outside observer that defendant has a scheme to exclude blacks."

In order to bring a claim for discriminatory discharge, the Plaintiffs must demonstrate that (1) they are members of a protected class; (2) they were qualified for their positions and performing at a level

---

1. As far as the Court can tell from the complaint and motions in this case, Plaintiff has not specifically plead a claim for hostile environment race discrimination under Title VII; as far as the Court can tell, his claim is for disparate treatment discrimination under Title VII. However, the Court notes that, even if he had, his claim would not succeed because Plaintiff has not shown that the alleged harassment was sufficiently severe or pervasive to constitute discrimination. *See Harris*

*v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

2. There is some confusion and contradiction in the record as to the name of the employee who was given the position with Quality Control. The Court does not find the name of the person dispositive for the resolution of this motion and will therefore assume that this is the proper name of this person, only for purposes of this motion.

that compared with the employer's legitimate expectations; (3) despite their qualifications, they were dismissed; (4) after their departure, the employer sought someone of roughly equivalent qualifications to perform substantially the same work. *See Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 5 (1st Cir.2000).

■■■ Defendant moves for summary judgment on Plaintiffs' claims, stating that they have failed to show that they were performing at a level that compared with the employer's legitimate expectations. Morales worked for Defendant from August 16, 2000 until his termination on February 13, 2001. During his last six months of employment, he demonstrated the following sales record: August 2000: 66% of quota, October 2000: 66% of quota, November 2000: 44% of quota, and January 2001: 49% of quota. Morales admits that he received memoranda notifying him of his deficient sales performance and admits that he knew that he could be terminated under Defendant's policy. Ortiz worked for Defendant from April 10, 2000 until his termination on October 12, 2001. His sales performance was as follows: June 2001: 55%, July 2001: 37%, September 2001: 34%. Plaintiff admits that he knew of Defendant's policy and that he knew he could be terminated based on his performance. Defendant provides a document titled "List of Involuntary Terminations Under Sales Policy" from July 2001 to May 2002, which lists approximately 80 people, indicating that Defendant terminates, on average, eight people per month for failing to reach their quotas. Thus, the termination of employees under the policy was common and does not appear from the evidence before the Court to be a scheme to terminate black employees. The Court finds that Defendant's policy of requiring its sales personnel to meet a certain sales quota is legitimate based on the nature of Plaintiffs' positions. Both Plaintiffs admit that they were not performing up to their employer's expectations, expectations that were an essential part of their position and that were codified as company policy. The Plaintiffs also do not provide any information as to who filled their positions. Thus, the Court finds that Plaintiffs have failed to plead a prima facie case for termination based on race under Title VII because they have failed to satisfy prongs two and four as listed above. Their inability to present a minimum showing of racial discrimination also proves fatal to his claims brought under 42 U.S.C. § 1981. Therefore, the Court **GRANTS** Defendant's motion for summary judgment as to the claims of Co–Plaintiffs Rafael Morales–Christian and Pedro Ortiz–Cruz brought under Title VII and 42 U.S.C. § 1981.

### B. *Claims Under Section 1983*

For reasons unknown to this Court, and likely due to some oversight, Plaintiffs bring a claim for race discrimination under 42 U.S.C. § 1983. Section 1983 is designed to provide claimants with a mechanism to redress violations of constitutional rights by state actors. Defendant is not a state actor. The Court urges the Plaintiffs to take more care when drafting future pleadings, as this is an obvious error. Therefore, the Court **DISMISSES WITH PREJUDICE** Plaintiffs' claims under 42 U.S.C. § 1983.

### C. *State Law Claims*

■■■ Plaintiffs have brought claims under Puerto Rico law. Because this is not a diversity case, the power of the federal court to hear and to determine state law claims depends on the presence of at least one "substantial" federal claim in the lawsuit. *Newman v. Burgin,* 930 F.2d 955, 963 (1st Cir.1991), *citing United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Federal jurisdiction hinges on the claim under the claims brought under Title VII and Sections 1981 and 1983 in this case. Since "pendent" or "supplementary" claims consist of state matters over which Congress did not grant federal courts independent jurisdiction, once the federal question issues are dismissed the Court may choose to dismiss the entire case. *See Newman v. Burgin*, 930 F.2d at 964. Therefore, the Court hereby **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims against Defendants arising under Puerto Rico law.

## V. CONCLUSION

The Court **GRANTS** Defendants' motion for summary judgment as to the claims of Co–Plaintiffs Francis Bermúdez Vázquez, David Massó Sabater, Pedro Ortiz, and Rafael Morales brought under Title VII, 42 U.S.C. § 2000e–2(a)(1) and 42 U.S.C. §§ 1981 and 1983. The Court **DISMISSES WITHOUT PREJUDICE** Plaintiffs' claims arising under Puerto Rico law.

IT IS SO ORDERED.